JUNE 1820.        COURT OF APPEALS, JUNE TERM, 1820.

BAPTISTE, *et al. vs.* DE VOLUNBRUN.

The act of 1796, *ch* 67, prohibiting the importation of slaves is applicable only to *voluntary importations*, and where *the importer intends to sell* the slaves, or *to reside* himself in the state An owner of slaves driven from *St. Damingo* by the insurrections in that island, and coming with his slaves to this state, is not with in the prohibition of the act of 1796, provided *he* does not intend to reside permanently in the state, or to sell the slaves. The declarations of such owner, of his intention to return to the island when the troubles there had ceased, are evidence of such intention, and if he does not become a naturalized citizen, are conclusive evidence, and this although he con tinues actually to reside here for any number of years If such owner goes first with her slaves, on her flight from *St Domingo*, to some other of the *United States*, and resides there for several years, and then comes with them to this state, because the climate of such other state was injurious to her health, she is not within the prohibition of the act of 1796 The laws of foreign states are facts, and must be proved as other facts——Historical evidence of them is insufficient.

APPEAL from *Baltimore* city court. This was a *petition* for freedom, and was submitted to *Baltimore* city court, upon the following statement of facts, viz. That the defendant, (the appellee,) being driven from the island of *Saint Domingo* by an insurrection of the negroes, fled to the city of *New-York*, carrying with her the petitioners, (the appellants.) She arrived at *New-York* in 1797, but finding the climate unfavourable to her health, removed to the city of *Baltimore*, with the petitioners as part of her family, in 1802. That she has constantly and uniformly declared her intention to return to her own country, when circumstances should permit, and for this reason never became a citizen of the *United States*, or of this state. That the petitioners having attempted to escape to *Saint Domingo*, she caused them to be sent to *New-Orleans*, as her property, subject to her future orders. *Baltimore* city court gave judgment upon this statement against the petitioners, and they appealed to this court.

The case was argued at this term, before BUCHANAN, EARLE, JOHNSON and DORSEY, J. by

*Raymond*, for the appellants. The facts upon which the petitioners ground their claim to freedom are, that they, and the defendant, were, in 1797, citizens of the Island of *St. Domingo*, a colony of *France*, and subjects of the *French* empire. That in 1797, they emigrated to *New-York*, and there remained five years. That in 1802, the defendant removed to *Baltimore*, and brought the petitioners with her, where they continued to live till after the filing this petition, and that the defendant is an alien. Since this petition was filed, and the summons served on the defendant, she has sent the petitioners to *New-Orleans*. This was a high-handed contempt of the justice of the state, and cannot therefore benefit the defendant. The foregoing facts are relied on as bringing this case within the *first section* of the act of 1796, *ch.* 67, which enacts, "that it shall not be lawful to import or bring into this state, by land or water, any negro, &c. for sale or hire, or to reside within this state; and any person brought into this state as a slave, contrary to this act, if a slave before, shall thereupon immediately cease to be the property of the person or persons so

importing or bringing such slave within this state, and shall
be free." The *second section* containing an exception in fa-
vour of *citizens* of other of the *United States*, coming to this
state to reside, and bringing their slaves with them; but as the
defendant is an alien, and not a citizen of any of the *Uni-
ted States*, she can claim no benefit from this section. The
*fourth section* contains an exception in favour of *travellers
and sojourners:* It is this, "that nothing in this act con-
tained shall be construed or taken to affect the right of any
person or persons travelling or sojourning with any slave
or slaves within this state, such slave or slaves not
being sold, or otherwise disposed of in this state, but car-
ried by the owner out of this state, or attempted to be car-
ried." Upon this section the defendant founds her right
to retain the petitioners in bondage. The question for this
court to decide, therefore, is, whether the defendant was a
*traveller* or *a sojourner* within this state, from 1802 till
1818, the time when this petition was filed, or whether she
was not a *resident* in this state during that period; if a *so-
journer*, then the petitioners are not free. What then is
the difference between a *resident* and a *sojourner?* A dif-
ference there must be, else the two sections of the statute
are co-extensive, and the one repeals the other. Did the
defendant in 1802, come to this state to *reside*, and has
she *resided* here ever since, or did she come here to *so-
journ*, and has she *sojourned* here ever since? The pre-
cise meaning of these words, and the difference between
them, cannot be ascertained by reference to lexicographers,
who usually give nearly the same meaning to both words.
But in law, and when used in statutes, they have a techni-
cal meaning, and are contra-distinguished one from the
other. Thus, when *sojournment* ends, *residence* com-
mences, and *vice versa;* so that the two words cover the
whole time. A man's home, where his family is establish-
ed, or where he himself is established in business, or takes
up his abode for a permanent or indefinite period, is his re-
sidence. If a man from a neighbouring state rents a farm
in this state for one year, and removes his family to it, he
becomes a *resident* the moment he does so, although he may
intend to return at the end of the year. So if a man from
an adjoining county rent a house in *Baltimore* for six
months only, and remove his family there, he becomes a
resident. So the defendant, by living sixteen years in

JUNE 1820.
Baptiste
vs
De Volunbrun

Baltimore with her family, has not only become a resident long since, but has shown that she came there to reside, the moment she came to the state, although she may have some distant and uncertain hope of leaving the state at some future period. The word *sojournment* is derived from the *French* substantive *sejour*, or the *French* verb *sejourner*, which means a temporary residence or dwelling for a short time. *Sejour* or *sejourner* is a compound word. To the word *jour*, which literally signifies a day, is prefixed the personal pronoun *se*, which gives it a personal signification, and restricts its application to persons. Neither the word *sejour*, nor any of its derivations, can with any propriety be applied to brute animals, or to any thing but the human species. It cannot with propriety be said of a horse that he *sojourns* in a place. Hence the literal meaning of the word *sejour*, or *sejournment*, is a dwelling in a place for a day only; and by an extended, and somewhat figurative mode of expression, it is used to signify a dwelling in a place *for a short time*, without ascertaining the precise length of time. This time of *sojournment* may be longer or shorter, in relation to the object to which it is applied. Thus it is said, that the children of *Israel* sojourned four hundred and thirty years in the land of *Egypt*. This is a figurative mode of expression, but may nevertheless be allowed, in regard to a nation, whose term of existence is indefinite, and may last many thousand years. In relation to a nation then, 430 years may be said to be *a short time;* but to speak of sojournment, in relation to an individual, for that period, would be absurd; and it would be very little less than absurdity to suppose the legislature, in their use of the term *sojournment* in this statute, contemplated a residence of sixteen years. If this latitude is given to the term, no reason can be given for limiting it to a period short of the duration of life. That the legislature did not use this term in any such unlimited sense, is manifest from the very nature and object of the statute. The object of the law was to restrain the further increase of slaves in this state by importations; but if such a latitude is given to the word *sojournment*, what is there to prevent the *West India* planters from removing to this state with their slaves, and remaining as long as they please? But the legislature has given a construction to this statute, from which this court is not at liberty to

depart. By an act passed in *April* 1783, *ch.* 23, the in-
troduction of slaves into this state was prohibited. This
act is in the same terms as the act of 1796, *ch.* 67, *s.* 1
and 4, except that the words *"for a short time"* are an-
nexed to the word *sojourners.* So that the act reads, *tra-
velling or sojourning for a short time,* &c. But it has al-
ready been shown, that sojourning, of itself, necessarily
imports dwelling in a place *for a short time.* Sojourning,
and *sojourning for a short time,* are precisely equivalent
expressions. The words *for a short time,* are mere tautó-
logy; they neither make the meaning more definite, nor
limited. The difference, therefore, between the phraseolo-
gy of these acts, merely shows, that the legislature in
1796, understood the import of the language used, better
than the legislature of 1783. The same construction,
therefore, which the legislature has put upon the act of
1783, must be put upon the act of 1796. By the act of
1792, *ch.* 56, it was enacted, that slaves imported, or to
be imported, by *French* subjects, who have removed, or
might remove, from any of the *French* islands into this
state, since the derangements in the *French* government,
should remain the property of their masters; but not so
as to affect any right such slaves might have acquir-
ed to freedom. It was also provided, by this last act, that
the subjects of *France,* who had sought, or might seek, an
asylum in this state, if they became citizens or settlers
therein, should be entitled to keep a certain number of
their domestic or house slaves, viz. a master of a family
five, and a single man three, and hold them; but if they
did not become citizens, or settlers, they might hold their
slaves for their own use, but not for sale, during their resi-
dence here. It was further directed, that *French* emi-
grants, who should import any such slaves, should, within
three months thereafter, deliver and lodge with the clerk
of the county a list of such slaves, and notify which he
intended to retain as his domestic or house slaves, which
list should be recorded, &c.

This was saying, in language which can not be misun-
derstood, that in the opinion of the legislature, under the
act of 1783, the exiles from *St. Domingo* could not bring
their slaves into this state, and retain them. For, if under
that act those exiles could bring any number of slaves into
this state, as it is contended may be done, what necessity

JUNE 1820. was there to pass the act of 1792? It is also to be observ..

Baptiste
vs.
The Volunbrun

ed, that the act of 1792 is an *enabling*, and not a *restraining* statute. The terms of the act are, that those exiles *may bring so many slaves*, &c. and not that they *may not bring more than* five, &c. It follows, that in the opinion of the legislature, without the act of 1792, those persons could not bring any slaves into this state, and retain them in slavery. Hence it follows, that the legislature has given a construction to the act of 1796; for where the terms of two acts are the same, a construction given to one, by the legislature, is a construction to both. The defendant can claim no benefit under the act of 1792, because it was repealed by 1797, ch. 75, before the petitioners were brought into the state; and besides, if it had not been repealed, the provisions of the act have not been complied with. The legislature, therefore, having said, that under the act of seventeen hundred and eighty-three, persons in the predicament of the petitioners could not be retained in slavery, this court is bound to say the same under the act of 1796. The defendant's counsel will rely upon the case of *De Fontaine, et al. vs. De Fontaine*, decided in this court in 1818, as a conclusive authority against the present petitioners *(a)*. In the first place it may be observed, that the court did not state the ground of their decision in that case, and it is wholly impossible to imagine upon what ground it was decided. It may, however, be presumed, that the court adopted the position taken by the Attorney General, the defendants' counsel in this case—which was, that the importation there was not a *voluntary* one, but an importation from *necessity*, which does not work a forfeiture. It is difficult, it is true, to discover any *necessity* for the importation in that case, unless the mere convenience of the master be a *necessity;* but whether there was any *necessity* in that case, or not; there certainly was none in this. These petitioners were first brought to *New York*, and there remained five years, and there surely was no necessity for there being brought to *Baltimore*, unless the defendant, not being allowed to hold them as slaves in *New York*, or the possible contingency, that the climate of *Baltimore* might be more congenial to her health, shall be considered a necessity. However vaguely the word *necessity* may be used in common parlance, yet in law it has a precise, tech-

*(a)* See that case reported at the end of this case.

nical meaning. *Inevitable necessity*, and the *act of God*,
are always used in law as equivalent expressions, and if
any other meaning be given to the word *necessity*, than
*the act of God*, there is an end to all precision and certain-
ty in the use of the term; it will have a different meaning
in every new case. The prospect of enjoying better health
—the greater security of property—nay, the more profita-
ble use of that property, may be converted into a *necessi-
ty*; and any number of slaves may be imported upon this
plea. Such a latitude has never been given in law to the
word *necessity*. If a vessel were driven by tempest upon
our coast, with slaves on board, it would be an importation
from *necessity*; but where the party has a choice whether
he will import or not, although it be a choice of evils, the
importation can never be said to be *involuntary*, either in
the legal or popular acceptation of the term. The impor-
tation, therefore, in this case, was not *involuntary*, or
from *necessity*, even into *New York*; and *a fortiori*, was it
not so into this state. But this case differs from that of
*De Fontaine, et al. vs. De Fontaine*, in another important
particular. In that case the defendant made several
attempts to take the petitioners out of the state, but
was unable to do so. In this, no such attempt has been
made. This case is, therefore, clearly distinguishable from
that, and is not necessarily affected by it, and even if it
was, that case ought not to be supported in direct opposi-
tion to the will of the legislature. When a legislature has
given a construction to a statute, that construction is em-
phatically the will of the legislature.

But these petitioners are free upon higher ground. In
1797 they were citizens of *St. Domingo*, a colony of
*France*, and of course subjects of the *French* empire. It
is a public notorious historical fact, that at that time there
were no slaves in *St. Domingo*, and of course these peti-
tioners were then free. If then free, they are free now.
In 1794 the *French* Convention passed a decree emancipa-
ting all the slaves in the *French* colonies. 1 *Bain's Hist.*
133. This was the legitimate act of the then legislative
power of *France*, and it took effect immediately. All
other legislative acts of that body have been recognised as
valid. The sale of the royal domains, the sequestration
of the ecclesiastical estates, the forfeiture of the estates of
the royalists who fled from *France*, are recognised by the

present Dynasty of *France*, as valid acts. This act of emancipation was equally valid and effectual. It is true, that in this state the *African* race are presumed to be slaves, and the *onus probandi* of freedom lies upon the petitioner; but this presumption arises out of a statutory provision, and cannot extend beyond the limits of the state. When it is proved, or admitted, that a person has been brought into this state from a foreign country, there can be no presumption of slavery arising from the colour of his skin. Such would be a most violent and unnatural presumption, more especially when it is known that the person has been brought from a country where slavery does not exist. In a country where the slave trade is tolerated, it might be expected that such a presumption would be made. The presumption would be perfectly in character with the trade, and those engaged in it; but in a country where this abominable traffic is condemned and prohibited under the severest penalties, where man's natural right to freedom is recognised, and proclaimed in the most solemn manner, for a court of justice to presume, merely from the complexion, without any other proof whatever, that a man is a slave, would be so repugnant to natural law, common sense, and common justice, as requires only to be stated, to be repudiated. The bare statement of such a doctrine shocks natural reason. Such a presumption, nine times in ten, would be contrary to the fact, for a small portion of the human race, with black skins, are slaves; and to presume that all persons without this state, as well as all within it, are slaves, because their skins are black or yellow, would be to give our statute an operation as extensive as the globe itself. But when it is admitted, that the petitioners were brought from a country where there were no slaves, to presume, in opposition to this, that they were slaves, would be carrying the doctrine of presumptions to an unheard of extent, and this too, in the opposite direction to which presumptions are usually carried; for it is a maxim of law that presumptions are to be taken *in favorem libertatis*; and in regard to all persons, extra-territorial, whether white or black, our statute does not interfere with this maxim, Whenever, therefore, it appears from the evidence in a cause, that a person has been brought into this state from any foreign state or country, the presumption of freedom immediately arises, and

the *onus probandi* of slavery is thrown upon the party

claiming. As, then, it does not appear that the petitioners in this case ever were the slaves of the defendant, or of any other person, but on the contrary, that there were no slaves in *St. Domingo* in 1797, the time when they left that island, it must be presumed that they were then free, and if then free, they are still so. The legislature of this state appears to have acted upon the idea that the slaves of *St. Domingo* were all emancipated by the decree of the *French* Convention, and to have considered that they had no right to afford protection to persons fleeing from that island to this state, with those blacks who were formerly their slaves. The act of 1792, *ch.* 56, was passed for the express purpose of protecting the exiles from that island. In 1794, the decree of the *French* Convention was passed. In 1797, our legislature repealed the act of 1792. No reason can be assigned for this repeal, except that the legislature were of opinion, that they had no right to protect the exiles in the possession of their slaves, after the decree for their emancipation had passed. There was the same, nay a stronger reason, for keeping the act in force in 1797, than there was for passing it in 1792, provided the condition of the slaves, and the rights of masters, had continued the same. The troubles commenced in *St. Domingo* in 1791, in consequence of an act of the *French* Convention, placing the free mulattoes and mustees upon an equal footing with the whites. The civil war then commenced which gave rise to our act of 1792. In 1794 the emancipating decree passed. This increased the troubles, and caused the war to rage with greater violence; and so it continued till 1802, when the *French* government, with *Buonaparte* at its head, as first consul, revoked the decree of 1794, and decreed that all the blacks that had been emancipated by that decree, should be again reduced to slavery; and to enforce this decree, Gen. *Le Clerc* was sent to *St. Domingo* with an army. Then it was that the troubles were at their height, and the demon of carnage and desolation stalked through the island in all his majestic horrors. Then it was that the greatest portion of whites fled from their houses, to *Baltimore*, for an asylum. And can any other reason be given, why the enabling act of 1792 should not have been kept in force till this time, except that the legislature believed all the blacks to be free, and therefore they

JUNE 1820.

Baptiste
vs
De Volunbrun

had no right to aid their original owners in retaining them in slavery?

*Rogers,* for the appellee. Protesting against the defendant's being considered as coming within the provisions or policy of any of the prohibitory laws of this state against the introduction of slaves, contended, provided this court are of a different opinion, that this case, by the very terms of the statement of facts, comes within the *fourth* section of the act of 1796, *ch.* 67. It cannot be, nor has it been contended, that this case comes within that clause of the *first* section, which prohibits an importation for sale, but it has been exclusively rested upon the ground of an intention to reside. It becomes then essentially important to the proper determination of the question, to come at the meaning intended by the legislature to be given to the term *"to reside."* In itself it is certainly indefinite, but all doubt is removed, and its intended meaning fully explained, by the *fourth* section, which points out what description of persons should not be considered as coming within the term, viz. Travellers and sojourners. By the introduction of the term *sojourner,* it also palpably appears, that the legislature meant to exclude from the prohibition and penalty of this law, not only persons who were passing through the state, but persons whose stay here was not of a permanent nature. That the legislature, which passed this act, intended a more liberal construction should be given by courts of justice to the term *sojourners,* and that the circumstances under which they came to the state, should have more effect in determining the opinions of courts of law on the question of sojournment, than the mere lapse of time, the court are requested to notice the fact, that by the *second* section of the act of 1783, *ch.* 23, which gives to travellers and sojourners the privilege of bringing their slaves into this state, that privilege is expressly limited to persons sojourning here for a *short time.* Whereas by the act of 1796, *ch.* 67, which repeals that law, the limitation of time is entirely omitted, and sojourners *generally* are declared entitled to the privilege of holding their slaves. Do the facts of this case bring the defendant within the meaning of the term *sojourner?* If they do, then is she equally within the exception, whether she came directly or indirectly from *St. Domingo.* According to that great philologist, Doctor *Johnson,* to so-

journ means "to dwell any where for a time—to live as
not at home—to inhabit as not in a settled habitation. So-
journ, a temporary residence—a casual and no settled ha-
bitation." Do not then the facts in this case show the de-
fendant to have lived here as not at home? Has not this
state been to her a casual, and not a settled habitation?
Her coming here has been the effect of a double compul-
sion; first, to avoid being massacred by the insurgent ne-
groes; and secondly, to avoid the fatal severity of a
northern climate upon the constitution of a person, who
had been born, and always had lived between the tropics,
under a burning sun. But could facts more conclusive-
ly be stated of her character of sojourner, than the
admission, that since the time of her arrival she has
constantly and uniformly declared her intention to return
to her own country, as soon as circumstances would per-
mit, and that, under this expectation, she refused to be-
come a citizen of the *United States?* But this case need
not be brought within any of the exceptions in the act of
1796, since we are warranted, by the opinion of this court
in *De Fontaine vs. De Fontaine,* in saying, that the unfor-
tunate refugees from the island of *St. Domingo* do not
come within the law prohibiting the importation of slaves
into this state. Cases of voluntary importation come only
within the provisions of that law. These unfortunate
exiles were driven by a force, which they could not resist,
from their homes, which was a colony of *France.* The
sanguinary revolution, which at that moment raged in the
mother country, only offered them the alternative of being
butchered by whites, instead of blacks, should they go
there; whilst this country held out to them, as it has al-
ways to oppressed humanity, in every shape and under
every circumstance, the hospitality of an asylum, and
they embraced it. To deprive them, under these circum-
stances, of the miserable pittance of property which they
were able to collect at the moment of embarkation, (for
their domestics constituted the principal part of it,) would
be saying to them—True, you, and all the oppressed and
persecuted of the world, have, as it were, a right to the
common benefits of our country, but as the price of this
hospitality, you must consent to be reduced to beggary.
We did not inform you, though you were ignorant even of
our language, that any terms or conditions were attached

to your coming; because you might, by removal, have then avoided the penalty of these terms; but there has been now discovered a latent meaning in our law, which at this day strips you of your only means of support in your old age; you may still enjoy the privileges of freemen in our land of liberty, but only on the condition of absolute poverty. We, the natives of the country, esteem it no crime in us to hold slaves; the laws give us the same absolute property in them as in our horses, but you are strangers, who must starve without the assistance of yours. If such were the decisions of our courts, might not these individuals, with some appearance of justice, accuse us of having invited them to our shores with one hand, for the purpose of stripping them with the other? Of such crying inhumanity, as well as injustice, we are happy to say, we have already been relieved by the decision of this very court in De Fontaine vs. De Fontaine, a case more favourable in its circumstances to the petitioners, than the present, since they were sent to this state from the island of Cuba, by the master, who never came to the United States. It cannot, therefore, for a moment be believed to be within the power of counsel, however ingenious, to point out to the court such discriminating circumstances between the two cases, as to induce it to pronounce the present petitioners free men, after having determined those in the case of De Fontaine vs. De Fontaine to be slaves.

BUCHANAN, J. delivered the opinion of the court.

The claim of the appellants to freedom is founded on the *first* section of the act of assembly of 1796, *ch.* 67, by which it is enacted, "that it shall not be lawful to import or bring into this state, by land or water, any negro, mulatto, or other slave, for sale, or to reside within this state; and any person brought into this state as a slave, contrary to this act, if a slave before, shall thereupon immediately cease to be the property of the person or persons so importing or bringing such slave within this state, and shall be free." The object of the law was to prevent an increase of the number of slaves in the state by voluntary importation; and it cannot be presumed, that the legislature contemplated the extreme case of fugitives for their lives from the horrid scenes of slaughter in *St. Domingo,* during the servile wars in that island; or if they were thought of, they were intended to be embraced by the *fourth* section, which

contains a saving of the "rights of any person or persons travelling, or sojourning, with any slave or slaves, within this state." The mere bringing slaves into the state is manifestly not prohibited. There must be something else; they must be brought "for sale or to reside." The *animus quo* fixes the character of the act; and if they are not imported or brought into the state for either of those purposes, it is neither within the letter, nor the spirit of the law. The intention must accompany the act; and though, where a man voluntarily brings slaves into the state, the presumption of law is against him—yet the law will never intend, that he who is forced to fly from his country, by causes not within his control, and with his slaves seeks refuge here, brings them either for sale or to reside. A man arriving here, under such circumstances, must be supposed to come without any purpose beyond that of saving himself and his property, and the presumption is decidedly against his bringing his slaves with any intention to violate the laws of the state.

The doctrine of necessity is well known to the law, and not now, for the first time, set up. The defendant in the case before us was driven to this country from *St. Domingo* by an insurrection of the negroes, and brought with her the petitioners, as her slaves; she was compelled to come by necessity, a *vis major*, which she could not resist, and that necessity is her protection. But it is said, that she first arrived at *New York*, and though she may have been driven by necessity from *St. Domingo*, the same necessity did not pursue her, after she reached *New York*, where she might have remained in safety, and that her coming into this state was a voluntary act. The answer to that argument is, that it appears, from the case stated, that she moved from *New York* to *Baltimore*, in consequence of the climate of the former being injurious to her health. She therefore had no choice, between becoming a sacrifice to the climate of *New York*, and going to some other place better suited to her constitution. It is, moreover, admitted, that she "has constantly and uniformly declared her intention to return to her own country whenever circumstances will permit her to do so with safety," and for that reason has never become a citizen either of this state, or any other of the *United States*. These declarations must be taken as a part of the *res gesta*, and are evidence of her

intention, and with the fact, that she has never become a citizen, are conclusive. She is a stranger in the country —an alien, without a fixed home—a sojourner wherever she goes, awaiting some favourable event, that may invite her back to the land from whence she has been driven. Under such circumstances, we think that her coming into this state from *New York* cannot affect her rights, or deprive her of any privileges to which she would have been entitled if she had come immediately from *St. Domingo* to *Baltimore.*

This cannot well be distinguished from the case of *De Fontaine vs. De Fontaine*, decided in this court at the June term 1818. In that case, M. and Madame *De Fontaine* were driven from *St. Domingo* by an insurrection of the negroes. He fled to the Island of *Cuba* with his two slaves, the petitioners, and she to *Baltimore* with her infant son. In the year 1805, he sent the two slaves to his wife and son in *Baltimore.* In 1808, Madame *De Fontaine* returned to *St. Domingo*, leaving her son, and the two slaves, whom she put into the hands of *Bonard,* under an agreement that they should be considered as a pledge for the return of a sum of money that he had advanced to her, and which she did remit. After she had gone, the negroes filed their petition for freedom in the court of oyer and terminer, &c. in *Baltimore,* where it was adjudged, that they were not entitled to their freedom; and on an appeal to this court, the judgment was affirmed.

In the course of his argument, the counsel for the appellants read, from *Bains's* history of the wars of the *French* revolution, an extract of a decree of the National Convention of the 25th of April, in the second year of the *French* republic, "which declares, that negro slavery, in all the colonies, is abolished," and earnestly contended, that as that decree was passed before the defendant was driven from *St. Domingo*, the petitioners were thereby liberated, and no longer remained the slaves of their former owner. But as foreign laws are facts, which, like other facts, must be proved before they can be received as evidence in courts of justice, the decree of the National Convention must be considered as not in the case, not being proved in any other way than by the book from which it was read, and no attempt to obtain an authentication of it appearing to have been made. It is not, therefore, necessary to inquire, what

would be the effect of that decree, if it was properly be-
fore us.

JUDGMENT AFFIRMED*(a)*.

(a) The case of De Fontaine *et al. vs.* De Fontaine, by
Bonard his Guardian, in this court at June term 1816, and re-
ferred to in the preceding case, was an *Appeal* from the court of
oyer and terminer, &c. for *Baltimore* county. It was a petition
for freedom preferred by the appellants, and the case was submit-
ted to the court below upon this statement of facts, viz.

That M and Madame *De Fontaine*, the lawful parents of
*Faustin De Fontaine*, the defendant, a minor, were driven from
their estate in the island of *St Domingo*, by an insurrection of
the negroes; and being in different parts of the island at the
moment of the insurrection, the husband fled to *St. Jago*, in the
island of *Cuba*, carrying with him his two slaves, the present pe-
titioners, whilst the wife fled to *Baltimore* with their only child
and heir, the present defendant. That towards the latter end of
the year 1805, *De Fontaine*, the father, in consequence of the
persecution of the *French* inhabitants in the island of *Cuba*,
found himself compelled to leave that country, and being a mili-
tary man, joined the *French* army under *Ferrand*, at St. Domin-
go, in hopes of recovering his former possessions by arms.
That at his departure, it not being possible to take them with
him, he shipped the petitioners to his wife and child, in *Balti-
more*, where they arrived in 1805, and have since continued.
That Madame *De Fontaine* was frequently desirous of leaving
this state to join her husband, and at one period was on the point
of doing so, with her child and the petitioners, but learnt at that
moment that *St Domingo* was besieged by the blacks, and that
her husband had fallen a sacrifice to the war. That, at length,
in November 1808, finding herself and family without the means
of existence, she left this place for *St. Domingo*, in hopes of col-
lect ng the little property her husband might have died possessed
of at that place, where she now resides. That at her departure,
not finding herself possessed of a sufficiency to pay her son's,
and the petitioners' passage, and that by the death of her hus-
band she had lost all hope of recovering his fortune for her son,
she determined on putting him to school three or four years, and
then binding him to a trade. That for the purpose of accom-
plishing this object, as her only means, she left the petitioners,
who are the defendant's property, in care of a certain Mr. *Bo-
nard*, her agent, in order that they might, by their services, af-
ford him the conveniences of washing and clothing, and by their
wages support their other expenses. That *Bonard*, in pursuance
of Mrs. *De Fontaine's* direction, placed the defendant during
three or four years at school, both in *Philadelphia* and *Baltimore*,
and in December 1814, bound him an apprentice for three
years, (at the end of which period he will be of age,) to Mr *Glas-
gow*, cordwainer of *Baltimore*, who in consideration of the pe-
riod when he was bound, it being during the war, refused taking
him, without a fee of fifty dollars, and *Bonard* paying all expen-
ses, except his shoes and board, which have been paid out of the
wages of the petitioners. That *Bonard* has the instructions of
the mother to ship her child and the petitioners to her at *St.
Domingo*, as soon as her son's apprenticeship is terminated, or
sooner if his time can be purchased. That Madame *De Fon-
taine*, not being able to pay the debts she had contracted in *Balti-
more*. or the price of her passage, *Bonard*, from motives of hu-
manity, advanced her money sufficient for the purpose; and that
*Bonard*, expressing some apprehension for the payment of his
money, Madame *De Fontaine* agreed that the petitioners should be
considered as a pledge for the remission of his money to him from

JUNE 1820.        COURT OF APPEALS, JUNE TERM, 1820.

*St. Domingo;* which has been done. That *Faustin De Fontaine,* the defendant, is the only legitimate heir of his parents, and was alone entitled to the petitioners at the death of his parents; provided, they should not be considered by this court as emancipated by the laws of this state. Upon this statement, judgment was rendered for the defendant in the court below, and the case was brought by appeal to this court. It was argued before BUCHANAN, EARLE, JOHNSON, MARTIN and DORSEY, J by *Raymond,* for the appellants, and by *Martin* (attorney general) for the appellee, who cited *De Kerleg and vs. Negro Hector,* 3 *Harr.* & *M'Hen.* 185. THE COURT OF APPEALS *affirmed* the judgment of the court below.